IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 7, 2017 Session

**ANTONIO MUNFORD v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 00-05477  W. Mark Ward, Judge**

———————————————————

**No. W2016-02593-CCA-R3-PC**

———————————————————

The Petitioner, Antonio Munford, filed a petition for writ of error coram nobis relief and a petition for post-conviction relief.  Following a hearing on the petitions, the trial court denied relief, finding that the Petitioner's post-conviction claims were time-barred and that the coram nobis claims were without merit.  On appeal, the Petitioner contends that he is entitled to due process tolling of the post-conviction statute of limitations and that the trial court abused its discretion in denying coram nobis relief.  Following a thorough review of the record and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Michael R. Working, Memphis, Tennessee, for the appellant, Antonio Munford.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

*Trial Proceedings*

On May 18, 2000, the Petitioner was indicted, along with co-defendants William Johnson, Mario Perry, and David Bond, for first degree felony murder in the perpetration of robbery in the death of Adnan Ali.  Following his indictment, trial counsel was

appointed to represent the Petitioner. In its order denying post-conviction and coram nobis relief, the trial court provided a summary of the underlying facts from the Petitioner's trial, as follows:

The State's principal witness was Fouad Ali. He testified that in the early morning hours of October 13, 1999, he was working at the Oil City convenience store located on Third Street in Memphis when three men entered the store. One of the men eventually pulled a shotgun from under his clothing and demanded that he lay on the floor. Meanwhile, another man, whom he identified in court as [the Petitioner], jumped on the counter and grabbed the store's gun, a .357 revolver, and tried to open the cash register. [The Petitioner] could not figure out how to open the register, so Mr. Ali told him which button to push. [The Petitioner] then opened the register and got the money out of the register. While this was taking place, Mr. Ali's brother, who had been sleeping in the back, came out of the back and [the Petitioner] shot him with the .357 revolver. Mr. Ali's brother died as a result of a single gunshot wound to his head. After the shooting, the three men left the store. Approximately $200 was taken in the robbery.

The store was equipped with a surveillance video. Exhibits 7-9 show the robbery in progress. In addition multiple photographs taken from frames of the videos were also introduced into evidence. The next day after the robbery, [the Petitioner] was identified as a suspect. On that same day, Mr. Ali identified [the Petitioner] in a photospread as the man who took the money from the cash register and who shot his brother. Again, on the day after the shooting, [the Petitioner] was brought in for questioning and gave two statements to the police.

***First statement:*** In his first statement [the Petitioner] indicated that before he went into the store . . . Mario Perry, David [Bond] and [the Petitioner's] uncle, William Johnson discussed robbing the Oil City in his presence. According to [the Petitioner], when [Mr. Bond] asked him how he felt about robbing the store, [the Petitioner] asked to be taken home. However, after [Mr. Bond] advised him that it would be a simple in and out situation, [the Petitioner] decided to go into the store to make a purchase. [The Petitioner] further stated that[,] when he came to the counter, [Mr.] Perry pulled out the shotgun and ordered the man to lie down. [Mr. Perry] then told [the Petitioner] [to] grab the money, but [the Petitioner] hesitated, after which [Mr. Bond] entered the store and both [the Petitioner] and [Mr. Bond] grabbed the money from the cash register. [The Petitioner] then stated he heard a shot, after which, the four men all left the store. In this

- 2 -

statement, [the Petitioner] denied responsibility for killing the victim and stated that [Mr. Bond] was the other person with a gun. Significantly, even in this first statement [the] Petitioner admitted entering into the store after discussions regarding a robbery of the store and admitted to obtaining some of the money out of the cash register. Also of major significance, in the first statement [the] Petitioner implicated [Mr.] Perry as the leader in the commission of the offense.

After giving this first statement, [the Petitioner] was shown the video surveillance tape and still photographs depicting [the Petitioner] as the sole person on the counter, after which, [the Petitioner] agreed to give a second statement.

***Second statement:*** [The Petitioner's] second statement begins with his acknowledgment that his first statement was not completely truthful. [The Petitioner] again indicated that he entered the store to make a purchase after he was told that the robbery would be an[] in and out situation; and that when he approached the counter [Mr.] Perry put the shotgun on the clerk, after which, [the Petitioner] jumped over the counter, grabbed the store's gun, opened the cash register and took the money out of the register. He then stated that he slipped, hit his head and the gun fired. He then ran out of the store. About $200 was obtained, which was split four ways between the four men. In this statement, [the Petitioner] admitted that [Mr. Bond] did not [] enter the store, admitted he was the one who took the store's gun, admitted taking the money from the register and admitted being the person who shot the victim in the head. He merely claimed that it was an unintentional shooting. Significantly, in this second statement [the] Petitioner once again implicated [Mr.] Perry as the leader in the commission of the offense.

. . . [T]he only defense witness at the trial was the [P]etitioner, Antonio Munford. [The Petitioner] testified on February 15, 2001. He testified under oath that he was [twenty] years of age at the time of his testimony.[1] . . . He began his testimony by stating that the two prior statements he gave to the police were a combination of truth and fiction. He testified that his uncle[,] William Johnson[,] and [Mr. Bond] mentioned on the night in question that they had just missed an opportunity to commit a robbery, and that five minutes later they said they were going to take care

---

[1] Based on the Petitioner's trial testimony, he would have been at least eighteen years old on the date of the offense.

of some business. Despite this talk of a robbery, [the Petitioner] testified that he merely thought they were going to get "high." [The Petitioner] then testified that he asked to go with the two men and they rode around in the car smoking marijuana until they pulled up on a parking lot near the Oil City. [The Petitioner] then testified that his uncle spotted [Mr.] Perry and he heard his uncle tell [Mr. Perry] about the incident in which they just tried to "knock off" the man with a money bag. [The Petitioner] testified that he then told the three other men that he was going into the store to get something to eat. As he was entering the store[,] he glanced back and [Mr.] Johnson and [Mr.] Perry followed him into the store, although he opened the door for them and they entered the store in front of him. [The Petitioner] further testified that as he approached the counter [Mr. Perry] pulled the shotgun on the clerk and told the clerk to get down on the floor. [Mr.] Perry then told [the Petitioner] to get the money, so he ran and jumped on the counter. [The Petitioner] then testified that he reached down and grabbed the store's gun and started trying to open the register. He could not get it open until Mr. Ali told him which button to hit. At that time he was holding the gun and trying to get the money at the same time. He then heard a voice say "watch out" and heard a "pow" after which he ran out of the store and passed the gun to [Mr. Perry], but did not have time to pass him the money from the cash register.

According to [the Petitioner], he briefly split up with the other men, but rejoined them at his uncle['s] grandmother's house[,] [a]fter which they rode around in the car smoking more marijuana and went to a Krystal. He testified further that he did not learn that there had been a killing involved in the robbery until the next day. However, [the Petitioner] testified . . . that he was the person who fired the shot that killed the victim, but claimed that there was no discussion regarding a plan to rob the Oil City before entering and that he actually did not enter with intent to rob the Oil City. He further admitted that he knew the clerk had a firearm in the store and that he got the gun before he got the money out of the cash register. He further explained that the shooting was not intentional and that he was so intoxicated that he did not even realize that he had fired the .357 revolver as he didn't notice any recoil. Finally, he re-emphasized that he did not enter the store with intent to participate in a robbery, but he also acknowledged that no one forced him into getting the money out of the cash register.

In essence, [the Petitioner's] trial testimony was basically consistent with his version of events in his second statement given to the police, except at trial he claimed no prior discussions or planning of the robbery

- 4 -

took place and he did not enter into the store with the intent to participate in the robbery. He did acknowledge his participation in the robbery, but, in essence, testified that it was a spur of the moment reaction to the events that unfolded without his prior knowledge. Again, at trial, [the] Petitioner implicated [Mr.] Perry as the leader in the commission of the offense.

Faced with a video depicting the Petitioner participating in the robbery and the fact that [the] Petitioner had given a typed confession to participating in the robbery and shooting the victim, [] trial counsel made an opening statement that emphasized to the jury that [the Petitioner] had been placed in a situation where he was forced to make a "split-second decision" as to how to react. In his closing argument, [the] Petitioner's trial counsel continued the version of the incident testified to by the Petitioner and simply contended that [the Petitioner] never entered the Oil City with intent to participate in a robbery.

Following deliberations, the jury found the Petitioner guilty as charged, and he was sentenced to life imprisonment. A motion for new trial was filed on July 12, 2001, which was overruled on August 1, 2001. No notice of appeal was filed by trial counsel.

On September 23, 2003, the Petitioner filed a pro se notice of appeal with this court.[2] He then filed a pro se motion to accept late-filed notice of appeal on October 10, 2003. On October 30, 2003, this court filed an order denying the Petitioner's motion to accept his late-filed notice of appeal and denied his request to waive the timely filing requirement found in Rule 4(a) of the Tennessee Rules of Appellate Procedure. A mandate was issued by this court on December 1, 2003.

*Post-Conviction and Coram Nobis Proceedings*

On July 27, 2012, the Petitioner filed a pro se petition for writ of error coram nobis. Attached to the pro se petition were several newspaper articles from 2004 which indicated that the Petitioner's trial counsel had been charged and convicted in federal court of various offenses relating to his involvement with the Gangster Disciples. The Petitioner asserted that he did not become aware of this information until June 14, 2012.

Following the appointment of counsel, the Petitioner filed two amended petitions for writ of error coram nobis. The Petitioner alleged in the amended petitions that he had

---

[2] The record reflects that the Petitioner first filed a notice of appeal in the trial court on September 20, 2003, and was advised by the clerk that he needed to file a motion to waive the timely filing of the notice of appeal and a motion to appoint counsel in this court.

been a juvenile at the time he committed the instant offense. The Petitioner also asserted that his co-defendant, Mario Perry, prepared an affidavit stating that the Petitioner was not involved in the conspiracy to commit the robbery and did not shoot the victim. He further alleged that his now-disbarred trial counsel had been a member of the Gangster Disciples and had pled guilty to "nearly two-dozen counts of criminal activity involving [h]is activity with the Gangster Disciples . . . ." He argued that trial counsel's "involvement in this case did not further the best interests of [the Petitioner], but the best interests of the Gangster Disciples and its members including [] co-defendants Perry and Johnson." The amended petition argued that the statute of limitations should be tolled because: (1) the claims in the present case arose after the statute of limitations had already run; (2) the Petitioner was mentally incompetent; and (3) because of trial counsel's misconduct.

The Petitioner, through appointed counsel, filed a petition for post-conviction relief on April 28, 2014. The petition for post-conviction relief raised the identical claims as raised in the petition for writ of error coram nobis and alleged the same grounds for due process tolling of the post-conviction statute of limitations. Additionally, the Petitioner asserted that trial counsel rendered ineffective assistance of counsel based on the following:

    1. Trial counsel did not legally waive the Petitioner's right to a transfer hearing in juvenile court.

    2. Trial counsel did not challenge the jurisdiction of the criminal court based on the lack of a transfer hearing.

    3. Trial counsel failed to file a motion to suppress the Petitioner's statements to police.

    4. Trial counsel did not file a motion to suppress the search in which weapons were discovered.

    5. Trial counsel never requested a mental evaluation.

    6. Trial counsel failed to raise a mental defect defense.

    7. Trial counsel failed to seek funds for an investigator.

    8. Trial counsel did not seek funds for an expert on eyewitness identification.

9. Trial counsel stated in opening statement that Mr. Perry would be a witness at trial.

10. Trial counsel failed to adequately prepare the Petitioner to testify.

11. Trial counsel advised the Petitioner to take responsibility for the actions of Mr. Perry and Mr. Johnson.

12. Trial counsel elicited testimony at trial about the statements of Mr. Perry and Mr. Johnson.

13. Trial counsel objected to the admission of the Petitioner's self-serving statement, in which he denied culpability.

14. Trial counsel failed to cross-examine police officers as to the misidentification of the Petitioner at the preliminary hearing.

15. Trial counsel abandoned the Petitioner after the motion for new trial was denied and failed to file a notice of appeal.

16. Trial counsel's performance in negotiations with the State was deficient as Mr. Perry and Mr. Johnson received lesser sentences for their involvement in the crime.

On November 10, 2015, the State filed a response to the petition for writ of error coram nobis. A hearing on both the petition for post-conviction relief and the petition for writ of error coram nobis was conducted over three days.

Mario Perry testified that he was currently incarcerated at the Hardeman County Correctional Facility (HCCF). He explained that he was originally charged with first degree felony murder along with the Petitioner, but he pleaded guilty to second degree murder and received a sentence of twenty-two years. Mr. Perry testified that his sentence was set to expire in June 2018. He recalled that each of the Petitioner's co-defendants received a lighter sentence than the Petitioner because they took plea deals.[3] Mr. Perry recalled that he and the Petitioner were both housed at HCCF following their convictions, but he and the Petitioner were not around one another and did not have any interactions for the first ten years of their confinement. Mr. Perry explained that, in the summer of

---

[3] According to Mr. Perry, co-defendant William Johnson entered a guilty plea in exchange for a fifteen-year sentence.

2012, the Petitioner got out of "solitary," and the Petitioner "ended up in the pod with [Mr. Perry]." At that time, he spoke to the Petitioner and presented the Petitioner with a newspaper clipping about the Petitioner's trial counsel. According to Mr. Perry, he knew trial counsel "through [a] mutual party . . . by [Mr. Perry] being a member of the Gangster Disciples . . . ." Mr. Perry explained that he was the "governor" of South Memphis for the Gangster Disciples and that a man named Jeff Holiday was the "overseer" for the entire state. Mr. Perry first met trial counsel at an "authority meeting," which he explained was a city-wide meeting of Gangster Disciples that every member of the gang was required to attend. He testified that individuals who were not gang members were not allowed in the meeting and that trial counsel's attendance indicated to him that trial counsel was a member of the Gangster Disciples. Mr. Perry said that co-defendants William Johnson and David Bond were also members of the gang but that the Petitioner was not and had no relationship to the organization.

During his testimony, the following colloquy took place regarding Mr. Perry's ability to communicate with gang members during his pretrial incarceration:

Q. What communications did you have from your organization regarding [trial counsel's] role in this trial as [the Petitioner's] attorney?

A. Really pretty much when I talked to my godbrother Shamar, I ma[d]e sure that he ha[d] [Mr. Holiday] relay a message to [trial counsel] to make sure that [the Petitioner] was still going to take the charge and all that.

Q. Okay. So you were communicating to the organization to make sure that [the Petitioner] was the person who went down and took the brunt of the punishment in this case?

A. Right.

Q. And what reason was that?

A. Because I was basically trying to get off the case all together. But I couldn't get off because they had my fingerprint. So I was basically stuck. But I was trying to make sure I didn't get the murder charge, the actual charge as the shooter.

Q. Okay. So you were trying to make sure that you weren't charged as the actual shooter. When you say they had your fingerprints, is that in the store or on a weapon or what do you mean by that?

A. Well, in the store.

Q. Okay. Were you attempting to influence the outcome by having . . . a person who was not a Gangster Disciple be the person who ends up being held responsible for the charge?

A. Right. Because it was more like better him than us. . . . So who better to put it on than the odd man out?

Q. And, again, his lawyer was a member of the organization?

A. Right.

Q. Is there any doubt in your mind whether he got that message?

A. Well, I know he got the message.

Q. Okay. Can you say how you know he got the message?

A. Like I said, my godbrother, whatever I communicate[d] to him, he relay[ed] it to [Mr. Holiday]. It's going to come right back the same way.

According to Mr. Perry, a police sergeant allowed him to speak to the Petitioner in a holding cell following the Petitioner's arrest. He told the Petitioner "to take the charge" and made sure that the Petitioner understood "what would happen" if "he didn't take the case[.]" Mr. Perry explained that he was trying to "save himself" by blaming the Petitioner. He threatened the Petitioner, and the Petitioner went to protective custody at the jail. Mr. Perry did not testify at the Petitioner's trial.

On cross-examination, Mr. Perry stated that the Petitioner did not have anything to do with the robbery, that the Petitioner was in the car at the time of the offense, and that the Petitioner did not know about plans to rob the store. He testified that he, William Johnson, and David Bond went into the store. He claimed that the Petitioner came into the store during the robbery, "but he turned around."

Laura Maceli testified that she worked at the Memphis Central Library. Ms. Maceli identified a newspaper article from the Commerical Appeal from 2004. She explained that she sent the document to the Petitioner after he requested the newspaper article in June 2012.

Dr. Frederick Steinberg, an expert in clinical and forensic psychology, testified on the Petitioner's behalf. He explained that he had a "working knowledge" of psychotropic drugs and how those drugs affect patients. Dr. Steinberg stated that he had never personally met with or assessed the Petitioner; however, Dr. Steinberg reviewed the Petitioner's mental health records from HCCF and explained that the Petitioner had been diagnosed as having psychotic disorder, not otherwise specified, and major depressive disorder, not otherwise specified. When asked if someone who suffers from psychosis would be able to manage their legal affairs, Dr. Steinberg replied:

> That's hard to say. I haven't assessed that. A psychiatric diagnosis doesn't necessarily translate to a legal status. However, what I can say is that . . . a person that has this kind of diagnosis has difficulties with reality testing, has difficulties with perceptual problems. What I mean by that is the potential of hallucinations, delusions and very potentially, problems with mood. In other words, they're not seeing the world like normal people would see the world. That's what a psychosis is.

Dr. Steinberg had not been provided a list of the Petitioner's current medications but testified that patients with psychosis were usually prescribed "medication consistent with psychotic symptoms." He stated that taking prescribed psychotropic medication would improve an individual's ability to manage their legal affairs. Dr. Steinberg stated that the Petitioner should be assessed to determine whether he was capable of managing his legal affairs but that he had not performed such an assessment.

Trial counsel testified that he was appointed to represent the Petitioner while the case was still in general sessions court. During his representation, trial counsel became aware that the Petitioner was a juvenile at the time of the offense, and he argued that the general sessions court did not have jurisdiction over the Petitioner based on his age. He explained that there was a discrepancy between the Petitioner's birth certificate and his age on the charging instrument. The birth certificate showed a birth date of June 18, 1982, but the arrest ticket indicated that the Petitioner was born in 1980. Trial counsel made an oral motion to have the case sent to juvenile court. However, the general sessions court judge found that it was a "typographical error" and proceeded hearing the Petitioner's case. Trial counsel agreed that he did not file a written motion in criminal court to challenge its jurisdiction over the Petitioner. Trial counsel stated that he had practiced in juvenile court and was familiar with transfer hearings. He stated that, as a seventeen-year-old charged with first degree murder, it was "[v]ery likely [the Petitioner] would have been transferred[,]" if a transfer hearing had been held.

Trial counsel testified that he and co-defendant Mario Perry "had some mutual friends[.]" Trial counsel acknowledged that he was no longer licensed to practice law, effective February 2004. Trial counsel was indicted in federal court for obstruction of a criminal investigation, tampering with a witness, and bribery in a matter unrelated to the Petitioner's case. Ultimately, trial counsel pled guilty to several counts relating to "improper interference with the Criminal Justice process[,]" based on his "altering a serial number" and his attempt to bribe a Memphis Police Department officer.

Trial counsel identified a letter he sent to the Petitioner dated March 14, 2002, which informed the Petitioner that, if he was going to be appointed appellate counsel, "[I]t may not be me." Trial counsel testified that he was not appellate counsel at that time. However, he acknowledged that he was appointed as trial counsel and stated that he could not recall ever being relieved of his appointment. Trial counsel also identified a letter received by his office from the Petitioner dated September 18, 2003, but he could not recall if he had ever seen the letter. Trial counsel agreed that he did not request a mental evaluation for the Petitioner and that no motion to suppress was filed in his case.

Trial counsel testified that the Petitioner was the first of the defendants to go to trial. Trial counsel recalled that the Petitioner confessed to police; the crime was recorded on videotape; and the Petitioner watched the video and identified himself in the video. However, the Petitioner told trial counsel that his confession was coerced. Trial counsel stated that the Petitioner had been identified in a photographic lineup by one of the victims, but the victim was unable to identify the Petitioner at the preliminary hearing. Trial counsel explained that Mr. Perry was set to testify against the Petitioner by the time of trial, but he could not recall why he stated in opening statement that Mr. Perry would testify. He also could not recall whether he prepared the Petitioner to testify. He denied telling the Petitioner to take responsibility for the shooting. He stated:

. . . I can tell you this for the record, very clearly, if [the Petitioner] had ever told me that he was responsible for a killing, or a shooting, I would have pled him guilty. The only reason I would have gone to trial is if a person told me they were innocent of the crime, or there were extenuating facts that led to his being less culpable.

Trial counsel acknowledged that he did not file a notice of appeal following the denial of the Petitioner's motion for new trial. He explained that it was "[n]ot [his] responsibility" and that he "didn't do [a]ppellate work." Additionally, trial counsel agreed that he did not obtain a waiver of direct appeal from the Petitioner. The following exchange then took place:

Q.  Well, did you explain his right to appeal to him before you concluded your trial, or responsibilities?

A.  In the last letter, the letter dated March 14, 2002, [it said that] if he requested [c]ounsel to appeal this conviction the [a]ppellate [c]ounsel would be able to receive that transcript from the court reporter.  So normally [this] would be m[e] saying, if you want to appeal the case the [c]ourt will appoint you an Appeals lawyer and follow that process, I don't do that.  That is sort of my canned answers.

Q.  That was the explanation that [the Petitioner] got?

A.  That is what most of my client[s] would have gotten.

Q.  And that was seven months after the motion for new trial?

A.  That would have been normal.

Trial counsel stated that he told the Petitioner shortly after his conviction that he "did not do appeal work."  He stated he told the Petitioner about his appellate rights "immediately after trial, so he'd have time to think about them and prepare what he wanted to do next."  Trial counsel asserted that his representation of the Petitioner ended in August 2001, after the motion for new trial hearing.  He recalled that, at that hearing, he was not appointed to appeal the Petitioner's case.  Trial counsel denied ever conspiring with the Petitioner's co-defendants to "frame" the Petitioner for the crime.

The Petitioner testified that, following his conviction, trial counsel did not inform him that trial counsel would not handle the appeal or that the Petitioner needed a different attorney for his appeal.  Instead, the Petitioner asserted that trial counsel told him that he was "going to do [the Petitioner's] appeal."  The Petitioner recalled that he wrote a letter to the appellate court clerk on January 4, 2002, inquiring about his appeal, and he was informed by the court clerk that he had no appeal pending.  The Petitioner then wrote a letter to trial counsel inquiring about the appeal, and trial counsel responded in a letter on March 14, 2002, telling the Petitioner to "be patient" and that he was "diligently working on [the Petitioner's] behalf[.]"  The Petitioner explained that he was housed at HCCF, which had a prison library where inmates worked as legal aides.  An inmate named T.T. Robertson helped the Petitioner prepare various legal documents relating to his case.  Mr. Robertson helped him prepare his initial notice of appeal, which he filed on September 23, 2003.  After the criminal court clerk indicated that the Petitioner's notice of appeal was late, Mr. Robertson assisted the Petitioner in filing a motion to accept a late-filed notice of appeal, which was filed with this court on October 10, 2003.  On October 30,

- 12 -

2003, this court then entered an order denying his request.  Mr. Robertson also helped write the Petitioner's pro se petition for writ of error coram nobis.

The Petitioner testified that he was taking Risperdal and a generic version of Seroquel while housed at HCCF in 2002 and 2003; he stated that these drugs were prescribed by mental health professionals in the prison.  The Petitioner explained that he spent about three days a week in mental health solitary confinement for the first decade of his incarceration due to his "trying to kill [himself]."  He stated that, while in mental health isolation, he did not have access to newspapers, radios, or televisions.  He agreed, however, that he was not in isolation for the entire time he was incarcerated.  The Petitioner recalled that he saw Mr. Perry in prison in 2012, after the Petitioner got out of mental health confinement.  Mr. Perry showed the Petitioner "a piece of paper" and told him that Mr. Perry and trial counsel were "best friends" and "in the same gang."  Mr. Perry advised the Petitioner to look for proof that Mr. Perry and trial counsel were in the same gang.  Mr. Perry also expressed regret that he pressured the Petitioner into giving statements to police that implicated the Petitioner.  After speaking to Mr. Perry, the Petitioner, with Mr. Robertson's assistance, wrote to the Memphis Central Library and asked for a copy of the newspaper article from the *Commercial Appeal*.  The library did not respond to the letter, so the Petitioner had someone go to the library and pay for the article.  The library then mailed the Petitioner a copy.

The Petitioner recalled that, when initially questioned by police, he did not give a statement.  Sometime after the Petitioner's initial questioning, one of his co-defendants gave a written statement naming the Petitioner as the shooter.  Investigators then brought the Petitioner back to the police department.  At that time, officers allowed Mr. Perry and Mr. Johnson to talk to the Petitioner, and they told him to take responsibility for the shooting.  According to the Petitioner, the detective "stepped out of the room to let [the Petitioner] talk with them[,]" at which time they told the Petitioner "what to say."  Mr. Perry told the Petitioner that he did not want to go back to jail and that "if [the Petitioner] didn't take the charge [the Petitioner knew] what was going to happen on the floors . . . because of the authority [Mr. Perry] had and the leadership he had in his gang."  The Petitioner explained that Mr. Perry threatened his family members as well.

The Petitioner was then interviewed by investigators and stated:

> I was in the car with those guys, didn't know exactly what was going to happen.  I did go in the store after they went in.  Yeah, some craziness happened and one of those guys shot.  I grabbed some money out of the cash register and I ran out.

However, after investigators confronted the Petitioner with inconsistencies in his story, the Petitioner told investigators, "All right. I was the guy in the orange hat. I was the guy with the gun. I was the guy that jumped up on the counter. . . . And then the noise happened and the gun accidentally went off."

The Petitioner told trial counsel about Mr. Perry's threats, but trial counsel told the Petitioner to "stick to [the] story, because [the Petitioner] shouldn't be here no [sic] way, because [he] was a juvenile." When asked if trial counsel ever told the Petitioner that he was a member of the Gangster Disciples, the Petitioner responded, "He said he had friends, a lot of friends and associates that [were] a part of this gang, that he knows a lot of the head people." The Petitioner denied that he was a member of the Gangster Disciples. The Petitioner said that trial counsel did not discuss trial testimony or strategy with him other than to tell the Petitioner to "stick to [his] story[.]" He agreed, however, that trial counsel's defense was to "try to get [the Petitioner] off on a technicality" based on the Petitioner's age at the time of the offense.

The Petitioner testified that he gave trial counsel his date of birth and told trial counsel that he was seventeen at the time of the offense. He did not recall trial counsel's argument to the general sessions court regarding his status as a juvenile. He agreed that, prior to the instant offense, he had been to juvenile court for disorderly conduct, shoplifting, assault, possession of marijuana, unauthorized use of a motor vehicle, and for running away. The Petitioner was eventually placed in the custody of the Department of Children's Services but ran away from the group home where he was placed when he was seventeen. The Petitioner denied telling investigators that he was an adult. However, the Petitioner admitted that he had previously lied to police officers about his age. He also acknowledged that his written confession, which he signed, listed his date of birth as June 18, 1981.

On cross-examination, the Petitioner agreed that he was "in and out" of solitary confinement and was otherwise housed in the mental health pod where he had more freedom and access to the prison's library. The Petitioner agreed that investigators showed him a video of the robbery, and he identified himself on the video as being the person in "the orange baseball type cap[.]" The Petitioner also acknowledged that his date of birth was listed as June 18, 1980, on the affidavit of indigency he filled out in criminal court. The Petitioner agreed that he lied on the affidavit of indigency and stated that he listed his date of birth as 1980 because "that's what all my other paperwork said." The Petitioner asserted that he was eighteen at the time of trial in February 2001. He stated that he never spoke to trial counsel about his mental health issues.

At the conclusion of the hearing, the trial court took the matter under advisement and then filed a written order denying both post-conviction and coram nobis relief on

December 9, 2016. In denying post-conviction relief, the trial court concluded that the Petitioner's claims of ineffective assistance of counsel were barred by the one-year statute of limitations applicable to petitions for post-conviction relief. The trial court further determined that the petition did not allege any of the statutory grounds for tolling the statute of limitations under Tennessee Code Annotated section 40-30-102(b) and that the Petitioner failed to establish the need for due process tolling. The trial court found that none of the Petitioner's claims arose after the statute of limitations period expired. Moreover, the court found that the Petitioner had failed to establish a prima facie case of legal incompetency by clear and convincing evidence. The trial court found that "[a]t best, the Petitioner established that [he] had been diagnosed as suffering from a psychotic disorder and mental depression in the years 2012-2013 and that he had been prescribed various medications while in prison in 2001-2003." The trial court found that there was "no proof" that his mental condition "rose to the level and standard required to toll the statute of limitations." Moreover, the trial court noted:

> [D]uring 2002-2003, when [the] Petitioner was taking medication, he had sufficient mental capacity on January 4, 2002, to write the appellate court clerk inquiring about the status of his appeal [], on September 19, 2003, to write [trial counsel] a letter inquiring about the status of his appeal [], on September 20, 2003, to prepare and mail a pro se Notice of Appeal [], to receive from the clerk a letter advising of the need to file a Motion to Accept Late Notice of Appeal [] and then prepare and file such a motion. [] It appears that the medication during that period of time did not keep him from addressing his legal concerns.

> Also of significance, is . . . the fact that[,] despite his diagnosis of psychotic disorder and depression in 2012-2013, he had sufficient mental capacity during that period of time to receive information about his case in June of 2012 and file a pro se Petition for Writ of Error Coram Nobis on July 27, 2012. It appears that his mental condition did not keep him from addressing his legal concerns at that time.

> Additionally, there is no evidence in the record about the period of time between 2003 and 2012, other than the Petitioner's testimony that he was in and out of mental health isolation. Further, no evidence was presented as to [the] Petitioner's *present* mental condition and no genuine issue arose in the course of the proceeding a[s] to [the] Petitioner's present competency.

The trial court noted that the Petitioner's testimony showed "an amazing sense of clarity and understanding."

The trial court further noted that "the law says that if [trial counsel is] appointed for purposes of the trial, you're automatically appointed for purposes of the appeal" but that trial counsel's conduct did not prevent the Petitioner from raising the claims of ineffective assistance of counsel at an earlier time. The trial court found that the Petitioner failed to diligently pursue post-conviction relief after discovering a violation of his constitutional rights, noting that the Petitioner knew that trial counsel had abandoned his appeal on October 30, 2003, but that he did not file a petition for post-conviction relief to request a delayed direct appeal until April 2014. Accordingly, the trial court determined that the Petitioner's post-conviction claims were barred by the statute of limitations.

Regarding the petition for writ of error coram nobis, the trial court found that the Petitioner was not entitled to relief based on Mr. Perry's testimony because the testimony was not credible. The trial court noted that Mr. Perry was "a convicted felon and a high-ranking member of a gang," that Mr. Perry admitted that he had previously committed perjury concerning the events of the robbery and murder, and that Mr. Perry's testimony at the evidentiary hearing regarding the Petitioner's participation in the crime was inconsistent. Moreover, the trial court found that Mr. Perry gave a pretrial written statement to investigators, detailing the Petitioner's involvement in the crime, which was corroborated by the Petitioner's own statements to investigators. Additionally, the trial court noted:

> . . . [The Petitioner] testified that he confessed because he was threatened by [Mr.] Perry who advised him to both confess and exonerate [Mr.] Perry. This testimony has a major flaw because all of [the Petitioner's] statements also implicated Mr. Perry as a ringleader in the crime who pulled the shotgun on the store clerk [and] initiated the robbery.

The trial court also determined that the Petitioner failed to present credible evidence that trial counsel had a conflict of interest in the case or conspired to convict the Petitioner of the crime and found that the fact that trial counsel was convicted of several crimes in federal court three or four years after the Petitioner's trial was not a fact that existed at the time of the Petitioner's trial, nor would it have been admissible as evidence at the Petitioner's trial. Accordingly, the trial court denied coram nobis relief. This timely appeal follows.

- 16 -

## II. Analysis

### *A. Timeliness of post-conviction petition*

On appeal, the Petitioner contends that the trial court erred by denying his petition for post-conviction relief as untimely. He asserts that he was entitled to due process tolling of the statute of limitations. The State responds that the trial court properly determined that the post-conviction petition was time-barred.

A petition for post-conviction relief must be filed "within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of the petition shall be barred." Tenn. Code Ann. § 40-30-102(a). "In Tennessee, a trial court's judgment becomes final thirty days after entry, unless a specified post-trial motion is filed, in which case the judgment becomes final upon 'entry of the order denying a new trial or granting or denying any other such motion or petition.'" *State v. Brown*, 479 S.W.3d 200, 205-06 (Tenn. 2015) (quoting Tenn. R. App. P. 4(c)). Because no appeal was filed in this case, the Petitioner's judgment of conviction became final on August 1, 2001, when the trial court overruled the Petitioner's motion for new trial. *See id.* Therefore, the Petitioner had until August 1, 2002, to file his petition for post-conviction relief. The instant petition was filed in April 2014, over eleven years beyond the statute of limitations.

Subsection 40-30-102(b) provides that "[n]o court shall have jurisdiction to consider a petition filed after the expiration of the limitations period unless" one of these three narrow circumstances apply:

(1) The claim in the petition is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required. The petition must be filed within one (1) year of the ruling of the highest state appellate court or the United States supreme court establishing a constitutional right that was not recognized as existing at the time of trial;

(2) The claim in the petition is based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted; or

(3) The claim asserted in the petition seeks relief from a sentence that was enhanced because of a previous conviction and the conviction in the case in which the claim is asserted was not a guilty plea with an agreed

sentence, and the previous conviction has subsequently been held to be invalid, in which case the petition must be filed within one (1) year of the finality of the ruling holding the previous conviction to be invalid.

Tenn. Code Ann. § 40-30-102(b).

Additionally, Tennessee courts "have previously recognized that in certain circumstances, strict application of the statute of limitations would deny a defendant a reasonable opportunity to bring a post-conviction claim and thus, would violate due process." *Williams v. State*, 44 S.W.3d 464, 468 (Tenn. 2001). Our supreme court has previously identified three scenarios in which due process requires tolling the post-conviction statute of limitations: (1) when the basis for the petition arose after the expiration of the statute of limitations; (2) when the petitioner's mental incompetence prevented the petition from being timely filed; and (3) when a petitioner was actively misled by an attorney's misconduct. *Bush v. State*, 428 S.W.3d 1, 23 (Tenn. 2014). Elaborating on the third exception, our supreme court concluded that a petition for post-conviction relief is entitled to due process tolling of the statute of limitations based upon the conduct of a petitioner's attorney when (1) the petitioner had been diligently pursuing his or her rights and (2) extraordinary circumstances prevented the timely filing of the petition. *Whitehead v. State*, 402 S.W.3d 615, 631 (Tenn. 2013) (citing *Holland v. Florida*, 560 U.S. 631, 649 (2010)). In explaining the first prong of the analysis, our supreme court stated that "pursuing one's rights diligently 'does not require a prisoner to undertake repeated exercises in futility or to exhaust every imaginable option, but rather to make reasonable efforts [to pursue his or her claim].'" *Bush*, 428 S.W.3d at 22 (quoting *Whitehead*, 402 S.W.3d at 631). "Moreover, the due diligence inquiry is an individualized one that must take into account the conditions of confinement and the reality of the prison system." *Whitehead,* 402 S.W.3d at 631 (quoting *Downs v. McNeil*, 520 F.3d 1311, 1323 (11th Cir. 2008)) (internal quotation marks omitted). The second prong of the due process tolling analysis "is met when the [petitioner's] attorney of record abandons the [petitioner] or acts in a way directly adverse to the [petitioner's] interests, such as by actively lying or otherwise misleading the [petitioner] to believe things about his or her case that are not true." *Id*. Additionally, due process tolling "'must be reserved for those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result.'" *Id.* at 631-32 (quoting *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000)).

The question of whether the one-year statute of limitations for filing a petition for post-conviction relief should be tolled under the Post-Conviction Procedure Act is a mixed question of law and fact that is subject to de novo review. *Bush*, 428 S.W.3d at 16. The post-conviction court's findings of fact, however, are binding on this court

unless the evidence preponderates against them. *Whitehead*, 402 S.W.3d at 621 (citing *Smith v. State*, 357 S.W.3d 322, 336 (Tenn. 2011); *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)). This court must defer to the post-conviction court's findings with respect to a witness's credibility and the weight of the evidence. *Id.* (citing *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999)).

## 1. Statutory tolling

Although not entirely clear, it appears from his brief that the Petitioner asserts he is entitled to statutory tolling under Tennessee Code Annotated section 40-30-102(b)(1). The Petitioner argues that he "fits into the narrow group of prisoners granted new rights by the *Whitehead* opinion" and that he had one year from the date of the filing of the opinion in *Whitehead* to file a petition for post-conviction relief. However, *Whitehead* did not create a new constitutional right not recognized as existing at the time of the Petitioner's trial. *See* Tenn. Code Ann. § 40-30-102(b)(1). Rather, the court in *Whitehead* merely "clarified Tennessee's due process tolling standard[.]" *Bush*, 428 S.W.3d at 22. We further conclude that, even if *Whitehead* had created a new constitutional right, the Petitioner would not be entitled to statutory tolling because he did not file his post-conviction petition until April 28, 2014, over a year after *Whitehead* was decided on March 21, 2013. The Petitioner cannot rely on this statutory tolling provision to save his untimely filed post-conviction petition.

## 2. Due process tolling

The Petitioner also asserts that he is entitled to due process tolling because extraordinary circumstances prevented the timely filing of his petition. Specifically, the Petitioner contends that: (1) his claims of ineffective assistance of counsel arose after the expiration of the statute of limitations when he learned of the reasons behind trial counsel's ineffectiveness, *i.e.*, that trial counsel was in a conspiracy to undermine his rights on appeal; (2) he was prevented from filing his petition in a timely manner because of mental incompetency; and (3) trial counsel abandoned the Petitioner on direct appeal and actively deceived the Petitioner regarding his representation. We will address each claim in turn.

### a. Later-arising claims

In certain circumstances, due process prohibits the strict application of the post-conviction statute of limitations to bar a petitioner's claim when the grounds for relief, whether legal or factual, arise after the point at which the limitations period would normally have begun to run. *Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995). In applying this rule to specific factual situations, courts should use a three-step analysis:

> (1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

*Id.* In making the final determination, courts must balance the petitioner's interest in "collaterally attack[ing] constitutional violations occurring during the conviction process" with the State's interest of "preventing the litigation of stale and fraudulent claims." *Burford v. State*, 845 S.W.2d 204, 207-08 (Tenn. 1992)).

As previously explained, the limitations period would normally have begun to run on August 1, 2001, upon the order of the trial court denying the Petitioner's motion for new trial because no appeal was filed in this case. Although most of the Petitioner's grounds of ineffective assistance of counsel arose during trial and, thus, before the post-conviction limitations period commenced, at least one ground for relief arose after August 1, 2001—the Petitioner's claim that trial counsel abandoned him after the motion for new trial was denied and failed to file a notice of appeal. However, we conclude that a strict application of the limitations period would not effectively deny the Petitioner a reasonable opportunity to present this later-arising claim. The trial court found that the Petitioner knew by October 30, 2003, that trial counsel had abandoned his appeal, but the Petitioner did not file a petition for post-conviction relief requesting a delayed direct appeal until April 2014. The Petitioner failed to diligently pursue post-conviction relief for over ten years after discovering a violation of his constitutional rights.

The Petitioner asserts that he should be excused for this failure because he did not learn the reason behind trial counsel's ineffectiveness, *i.e.*, that trial counsel conspired with his co-defendants to frame the Petitioner, until he spoke to Mr. Perry in 2012 and obtained newspaper articles confirming trial counsel's convictions in federal court. We note, however, that the Petitioner failed to offer credible evidence to support his claim of a conspiracy between trial counsel and the Petitioner's co-defendants at the post-conviction hearing. Additionally, the Petitioner does not explain why it was necessary to know the information provided by Mr. Perry prior to filing a petition for post-conviction relief. As noted by the State in its brief, "Petitioners commonly file post-conviction petitions based upon failures of counsel at trial without knowing the reasoning behind counsel's actions[,]" and if the Petitioner was abandoned by trial counsel on appeal as alleged, then the Petitioner would have been entitled to a presumption of prejudice and a delayed direct appeal, regardless of the reasons behind trial counsel's abandonment. *See Wallace v. State*, 121 S.W.3d 652, 658-60 (Tenn. 2003). Thus, the Petitioner should have

pursued post-conviction relief when he learned that trial counsel failed to file an appeal in 2003.

The Petitioner also argues that he was unable to pursue post-conviction remedies earlier because he was in mental health isolation in prison. However, the Petitioner admitted that he was often only in solitary confinement for a few days at a time and that he was otherwise housed in the mental health pod where he had more freedom and access to the prison's law library and legal aides. The record indicates that the conditions of his confinement did not prevent the Petitioner from discussing his case with Mr. Robertson, a legal aide at the prison, and requesting information on the status of his direct appeal in 2002 and in 2003, filing of a notice of appeal and motion to accept the late-filed notice in 2003, sending a letter to the Memphis Central Library requesting newspaper articles in 2012, and filing his pro se petition for writ of error coram nobis relief in 2012. The delay of more than ten years between the Petitioner's learning of trial counsel's abandonment on appeal and his filing of a petition for post-conviction relief demonstrates a lack of diligence on the part of the Petitioner. Due process tolling is not appropriate for this later-arising claim.

<u>b. Mental incompetency</u>

The Petitioner also contends that he is entitled to due process tolling due to his mental incompetency. Our supreme court has addressed the showing required to make out a prima facie case of mental incompetency for due process tolling of the statute of limitations:

> In the interest of uniformity and simplicity, we have determined that the standards and procedures in Tenn. Sup. Ct. R. 28, § 11 should henceforth be used in all post-conviction proceedings . . . in which the issue of the petitioner's competency is properly raised. Thus, Tenn. Sup. Ct. R. 28, § 11 will apply not only when a petitioner seeks to withdraw a previously-filed petition for post-conviction relief, but also when a petitioner seeks to toll the statute of limitations in Tenn. Code Ann. § 40-30-102(a) due to incompetency . . . .

> In light of the importance our society ascribes to personal autonomy, the inquiry should begin with a presumption that the petitioner or prisoner is competent. . . . [The petitioner] must make a prima facie showing that [the petitioner] is incompetent by submitting affidavits, depositions, medical reports, or other credible evidence that contain specific factual allegations showing the petitioner's incompetence.

- 21 -

. . . .

The competency standard applicable to these proceedings is whether the prisoner possesses "the present capacity to appreciate [his or her] position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether the petitioner is suffering from a mental disease, disorder, or defect which may substantially affect the petitioner's capacity." Tenn. Sup. Ct. R. 28, § 11(B)(1). The question is not whether the prisoner is able to care for himself or herself, but whether the prisoner is able to make rational decisions concerning the management of his or her post-conviction appeals.

*Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 512-13 (Tenn. 2013) (footnotes, internal quotations, and citations omitted); *see also Heath v. State*, No. W2016-00786-CCA-R3-PC, 2017 WL 3895230, at \*2 (Tenn. Crim. App. Sept. 5, 2017) (applying the test from *Reid ex rel. Martiniano* to determine that the petitioner failed to establish the need for due process tolling of the post-conviction statute of limitations based on his alleged mental incompetence), *perm. app. filed*. If a prima facie showing is made, the post-conviction court should then "schedule a hearing to determine whether the [petitioner] is competent to manage his [or her] petition." *Id.* at 512. The burden is on the petitioner to prove "that he or she is mentally incompetent by clear and convincing evidence." *Id.* at 494 (citing Tenn. Code Ann. § 40-30-110(f)).

In this case, the trial court found that the Petitioner failed to make out a prima facie case of mental incompetency. The trial court found that "[a]t best, the Petitioner established that [he] had been diagnosed as suffering from a psychotic disorder and mental depression in the years 2012-2013 and that he had been prescribed various medications while in prison in 2001-2003." The trial court stated that there was "no proof" that that his mental condition "rose to the level and standard required to toll the statute of limitations." Moreover, the trial court noted:

[D]uring 2002-2003, when [the] Petitioner was taking medication, he had sufficient mental capacity on January 4, 2002, to write the appellate court clerk inquiring about the status of his appeal [], on September 19, 2003, to write [trial counsel] a letter inquiring about the status of his appeal [], on September 20, 2003, to prepare and mail a pro se Notice of Appeal [], to receive from the clerk a letter advising of the need to file a Motion to Accept Late Notice of Appeal [] and then prepare and file such a motion. [] It appears that the medication during that period of time did not keep him from addressing his legal concerns.

- 22 -

Also of significance, is [] the fact that despite his diagnosis of psychotic disorder and depression in 2012-2013, he had sufficient mental capacity during that period of time to receive information about his case in June of 2012 and file a pro se Petition for Writ of Error Coram Nobis on July 27, 2012. It appears that his mental condition did not keep him from addressing his legal concerns at that time.

Additionally, there is no evidence in the record about the period of time between 2003 and 2012, other than the Petitioner's testimony that he was in and out of mental health isolation. Further, no evidence was presented as to [the] Petitioner's *present* mental condition and no genuine issue arose in the course of the proceeding a[s] to [the] Petitioner's present competency.

Upon review, we agree with the trial court's conclusions. Although the Petitioner presented testimony from Dr. Steinberg that he had been diagnosed as having psychotic disorder, not otherwise specified, and major depressive disorder, not otherwise specified, Dr. Steinberg acknowledged that he had never personally met with or assessed the Petitioner. When asked if someone who suffers from psychosis would be able to manage their legal affairs, Dr. Steinberg replied, "That's hard to say. I haven't assessed that. A psychiatric diagnosis doesn't necessarily translate to a legal status." However, Dr. Steinberg stated that taking prescribed psychotropic medication would improve an individual's ability to manage their legal affairs, and the Petitioner testified that he took Risperdal and a generic version of Seroquel while housed at HCCF in 2002-2003, which had been prescribed by mental health professionals in the prison. Additionally, the record shows that, while the Petitioner was taking his medication, he had sufficient mental capacity to write letters inquiring about the status of his appeal. The Petitioner failed to establish by clear and convincing evidence that the statute of limitations should be tolled due to his alleged mental incompetence.

### c. Trial counsel's abandonment and deception

In *Whitehead*, the petitioner's appellate counsel miscalculated the deadline for filing for post-conviction relief and did not send the petitioner's case file to him until the correct deadline had passed. *Whitehead*, 402 S.W.3d at 621. In its application of the two-prong test to the petitioner's case, the supreme court determined that the petitioner had pursued his rights diligently; the petitioner began researching post-conviction case law when he received the letter from his appellate counsel with the incorrect filing date and drafted a thirty-two-page petition, which he submitted by the incorrect deadline. *Id.* at 632. The supreme court also concluded that the petitioner "faced an extraordinary combination of circumstances that prevented him from filing his post-conviction petition on time-circumstances that were tantamount to attorney abandonment." *Id.* Therefore,

the Tennessee Supreme Court held that "the principles of due process and fundamental fairness require that the statute of limitations" in the Post-Conviction Procedures Act be tolled. *Id.* at 634.

Unlike the petitioner in *Whitehead*, we cannot conclude that the Petitioner was diligently pursuing his rights under the first prong of the *Whitehead-Holland* test. Even if we conclude that trial counsel abandoned the Petitioner on direct appeal, we agree with the trial court that nothing prevented the Petitioner from filing his petition in the intervening years between his discovery in October 2003 that trial counsel had abandoned his appeal and the filing of his post-conviction petition in April 2014. Considering the General Assembly's clear preference that the post-conviction statute of limitations be strictly construed, we do not find this to be one of those rare cases in which it would be "unconscionable to enforce the limitation period against the [petitioner][.]" *Id.* at 631-32.

Because the petition is untimely and due process considerations do not require tolling of the statute of limitations, the post-conviction court properly dismissed the petition as time-barred.[4]

### B. Petition for writ of error coram nobis relief

The Petitioner also contends that the trial court erred by denying coram nobis relief. He asserts that he presented newly discovered evidence showing that trial counsel was engaged in a conspiracy with the Petitioner's co-defendants during his representation of the Petitioner and that trial counsel was working against the Petitioner's interests. The State responds that the trial court properly denied the coram nobis petition because the trial court discredited Mr. Perry's testimony and because the Petitioner failed to offer admissible evidence of a conspiracy between trial counsel and the Petitioner's co-defendants.

Tennessee Code Annotated section 40-26-105 provides relief in criminal cases by petition for error coram nobis and states in pertinent part:

> The relief obtainable by this proceeding shall be confined to error dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present

---

[4] In addition to arguing that he is entitled to due process tolling, the Petitioner contends that he is entitled to relief on the merits of his post-conviction petition. Because we resolve this matter on the timeliness of his post-conviction petition, we do not reach the merits of the petition.

certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn. Code Ann. § 40-26-105(b) (2016). A petition for writ of error coram nobis should recite:

(a) the grounds and nature of the newly discovered evidence; (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial; (c) the petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (d) the relief sought by the petitioner.

*State v. Hart*, 911 S.W.2d 371, 374-75 (Tenn. Crim. App. 1995) (internal citations and quotation marks omitted).

The writ of error coram nobis is "an *extraordinary* procedural remedy," providing relief in only a limited number of cases. *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999) (emphasis in original). "The purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" *Hart*, 911 S.W.2d at 374 (quoting *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1966)). The decision of whether to grant or deny a petition for writ of error coram nobis on its merits rests within the sound discretion of the trial court. *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007); *Hart*, 911 S.W.2d at 375. Before granting relief, the evidence must establish, and the trial court must find, "that the subsequently or newly discovered evidence 'may have resulted in a different judgment had it been presented at the trial.'" *Hart*, 911 S.W.2d at 375 (quoting Tenn. Code Ann. § 40-26-105). The newly discovered evidence must be admissible and credible because the ultimate issue is whether the result at trial would have been different with all relevant evidence presented. *Wilson v. State*, 367 S.W.3d 229, 235 (Tenn. 2012). Accordingly, the trial court must be "reasonably well satisfied" with the veracity of the new evidence. *Vasques*, 221 S.W.3d at 527.

In this case, the trial court determined that the Petitioner failed to present credible evidence that trial counsel conspired with the Petitioner's co-defendants to convict the Petitioner of the crime or that trial counsel had a conflict of interest. The trial court found that Mr. Perry's testimony—that he threatened the Petitioner "to take the charge" and that he colluded with other gang members and trial counsel to have the Petitioner held responsible for the shooting—was not credible. The trial court noted that Mr. Perry was

a convicted felon and a high-ranking gang member. His testimony at the evidentiary hearing regarding the Petitioner's participation in the crime was inconsistent, and Mr. Perry gave a written statement to police implicating the Petitioner before trial. Moreover, trial counsel specifically denied participating in a conspiracy to frame the Petitioner with the crime, and the Petitioner offered no testimony or other evidence that trial counsel influenced the Petitioner's written admissions to police or the substance of the Petitioner's trial testimony. A review of the trial record reflects that trial counsel pursued a reasonable defense strategy in light of the overwhelming evidence against the Petitioner. Specifically, the State established the Petitioner's guilt through video surveillance, eyewitness testimony identifying the Petitioner as the shooter, and the Petitioner's own admissions to committing the crime. Under these circumstances, the trial court did not abuse its discretion by denying coram nobis relief based on the Petitioner's claims.

### III. Conclusion

For the aforementioned reasons, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE